1

2

3

4

5

6

7

8

9

10

11

12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DAVID ENGELSTEIN,

            Plaintiff,

    v.

UNITED STATES DEPARTMENT
OF AGRICULTURE, et al.,

            Defendants.

C20-0916 TSZ

ORDER

13

14

15

16

17

      THIS MATTER comes before the Court on Defendant United States of America's

motion to dismiss for lack of subject matter jurisdiction, docket no. 124, and motion to

strike, docket no. 173.  The Court having previously entered a Minute Order, docket

no. 175, granting the motion to dismiss and denying the motion to strike, now enters the

following order explaining its reasoning.

18

## **Overview**

19

20

21

22

      On June 18, 2017, Plaintiff David Engelstein was riding his bicycle on the Middle

Fork Road (the "Road") in North Bend, Washington.  Second Am. Compl. ("SAC") at

¶ 5.1 (docket no. 58); Ex. C to Johnson Decl. at 2 (docket no. 125-3).  At the time of

Engelstein's bike ride, the Road was under construction pursuant to the Middle Fork

23

Snoqualmie River Road Reconstruction Project (the "Project").  A portion of the Road was constructed of grate panels.  SAC at ¶ 5.1.  Engelstein alleges that, while crossing over the grate surface, he fell because his bike tire got wedged within a gap between the grate panels and he sustained serious injuries.  *Id.* at ¶ 5.2.

**A.    The Middle Fork Snoqualmie River Road Reconstruction Project**

The Road is owned by King County (the "County").  *See* Ex. A to Johnson Decl. at 2–6 (docket no. 125-1); Pl.'s Resp. Br. at 2 & 8 (docket no. 149).  The Road was under construction pursuant to a contract between the Federal Highway Administration ("FHWA"), the United States Forest Service (the "Forest Service"), the County, and Active Construction, Inc. ("ACI").  Following a study on the impact of paving the Road, the FHWA, the Forest Service, and the County agreed to reconstruct approximately 9.7 miles of the Road.  *Id.*; *see also* Ex. B to Johnson Decl. at 1 (docket no. 125-2), Ex. C to Johnson Decl. at 1–3.  The FHWA solicited bids for the Project and ultimately awarded a contract for the Project to ACI (the "Contract").  Ex. D to Johnson Decl. at 1–2 (docket no. 125-4).

The Contract tasked ACI with constructing a 20-foot paved roadway, reconstructing two bridges and replacing one bridge with a culvert, replacing numerous existing roadway culverts, and upgrading signing and other roadside safety features.  Ex. B to Johnson Decl. at 1.  The Contract also called for ACI to design, manufacture, and install low water crossings.  Ex. D to Johnson Decl. at 56–59; Ex. E to Johnson Decl. at 1–49 (docket no. 125-5).  Specifically, the Contract provided that ACI would design, manufacture, and install "precast reinforced concrete box culverts and associated curb

1    headwalls, stem walls, and wing walls according to layouts and requirements shown on

2    the plans."  Ex. D to Johnson Decl. at 56.  The work also consisted of "designing and

3    constructing three-sided concrete trench drains with removable steel grates according to

4    layouts and requirements shown on the plans."  *Id.*

5         When designing the low water crossings, the FHWA and ACI had to consider

6    certain regulations, administrative guidance documents, and policy manuals, many of

7    which served as non-mandatory guidance for the designers and engineers.  *See* Exs. H–K

8    to Johnson Decl. (docket nos. 125-8–125-11).  A separate agreement between the federal

9    agencies and King County stated that the low water crossings would be designed in

10   accordance with the American Association of Highway and Transportation Officials

11   ("AASHTO") specifications.  Ex. A to Johnson Decl. at 3.  In addition, the Contract

12   incorporated the Standard Specifications for Construction of Roads and Bridges on

13   Federal Highway Projects ("Standard Specifications"), and it supplemented the Standard

14   Specifications with specific language tailored to the Project.  Ex. D to Johnson Decl. at

15   29–32; Ex. G to Johnson Decl. (docket no. 125-7).  The Standard Specifications required

16   contractors to "[p]repare drawings as necessary to construct the work[,]" furnish the

17   drawings "for acceptance before performing work covered by the drawings[,]" and

18   "[o]btain written approval before changing or deviating from the accepted drawings."

19   Ex. G to Johnson Decl. at 17.  The Contract supplemented the Standard Specifications by

20   identifying specific drawings that ACI was required to prepare and submit for the Project,

21   which included drawings for the low water crossings.  Ex. D to Johnson Decl. at 35–37.

22

23

1    Prior to construction, ACI and its subcontractor, OldCastle Precast ("OldCastle"),

2 submitted design drawings for the low water crossings to the FHWA and the County for

3 approval.  Ex. E to Johnson Decl. at 1–5.  The FHWA, the Forest Service, and the County

4 approved these designs in June 2014.  *Id.*  In August 2014, Oldcastle and ACI submitted

5 additional drawings with additional detail regarding the grates, knowing that the

6 Washington Department of Transportation ("DOT") would inspect them.  *Id.* at 31–34.

7 The FHWA and the County approved the supplemental designs in August 2014.  *Id.* at

8 35–49.

9    After the final design plans were approved, OldCastle manufactured, and ACI

10 installed, the low water crossings.[1]  The Contract provided that "at all times during

11 performance" of the Project "and until the work is completed and accepted, [ACI] shall

12 directly superintend the work or assign and have on the worksite a competent

13 superintendent who is satisfactory to the [FHWA] and has authority to act for [ACI]."

14 Ex. D to Johnson Decl. at 23.  ACI was also responsible for obtaining its own permits,

15 licenses, materials, and equipment.  *Id.* at 23.  In addition, ACI agreed to assume all

16 responsibility for injuries arising as a result of its own negligence.  *Id.*

17    The Standard Specifications contained provisions regarding construction of the

18 Project.  Specifically, the Standard Specifications provided that ACI was required to

19 "[i]ndemnify and hold harmless the Government, its employees, and its consultants from

20

21 [1] In a previous order, the Court dismissed plaintiff's claims against ACI and OldCastle because they were
22 joined as defendants after the three-year statute of limitations had expired and neither tolling nor relation-
back doctrines applied.  Order at 9–10 (docket no. 90).

23

ORDER - 4

suits; actions; or claims brought for injuries or damage received or sustained by any person, persons, or property resulting from the construction operations arising out of the negligent performance of the contract." Ex. G to Johnson Decl. at 36, § 107.05.  In addition, the Standard Specifications state that during "the performance of the contract, the Contractor is an independent contractor and neither the Contractor nor anyone used or employed by the Contractor shall be an agent, employee, servant, or representative of the Government." *Id.* at 37, § 107.09.  The Standard Specifications also state "[s]ubcontracting does not relieve the Contractor of liability and responsibility under the contract and does not create any contractual relation between subcontractors and the Government.  The Contractor is liable and responsible for any action or lack of action of subcontractors." *Id.* at 39, § 108.02.

By June 2017, the time of Engelstein's accident, the Project neared completion. Construction was ongoing, although not on the grates at issue.  On July 10, 2017, the FHWA deemed the project substantially complete, and relieved ACI of its maintenance responsibilities.  Ex. C to Johnson Decl. at 1; Ex. F to Johnson Decl. at 1 (docket no. 125-6).  ACI finished work on the project in December 2017.[2]

---

[2] The SAC is ambiguous as to whether ACI installed the grates at issue or whether the grates preexisted the construction.  *See* SAC at ¶ 5.4.  Regardless, in a June 30, 2023, status conference, the parties agreed that ACI installed the subject grates prior to the accident.

**B.**    <u>Engelstein's Claims</u>

Engelstein asserts that the United States is liable for his injuries under the Federal Tort Claims Act ("FTCA").[3]  SAC at ¶¶ 4.6 & 6.1.  Engelstein alleges that the United States was negligent because the low water crossing grates were improperly constructed, installed, and maintained, which led to his injuries.  SAC at ¶ 5.3; Pl.'s Resp. Br. at 8. Engelstein also appears to allege that the United States negligently approved the design of the grates.  SAC at ¶ 5.3; Nordstrom Report at 9 (docket no. 144-3) ("[T]he grate panel gaps could not have been eliminated in the field either at the time of installation or after the subject accident and were effectively 'designed into' the assembly.").  In sum, Engelstein seeks to impose vicarious liability on the United States for a contractor's allegedly negligent construction, installation, and maintenance of the grates, and direct liability for the United States' negligent approval of the design for the grates.

The United States contends that this Court lacks subject matter jurisdiction under the doctrine of sovereign immunity.  Although the FTCA generally waives sovereign immunity for negligence claims, the United States argues that sovereign immunity applies in this case because of two exceptions to the FTCA's waiver: the independent contractor exception and the discretionary function exception.

---

[3] The named federal defendants include the United States Department of Agriculture, United States Forest Service, United States Department of Transportation, United States Department of Highways, United States Federal Highway Administration, and the Western Federal Lands Highway Division of the FHWA. SAC at 1 & ¶¶ 2.1–2.5.  This Order refers to the federal defendants collectively as the "United States."

1   **<u>Discussion</u>**

2   **A.      <u>The United States' Motion to Strike</u>**

3          On July 31, 2023, Plaintiff filed a supplemental response, docket no. 171, to the

4   United States' motion to dismiss, along with the Declaration of Greg Gebhard, docket

5   no. 170.  The United States filed a motion, docket no. 173, to strike Plaintiff's

6   supplemental response and the Gebhard Declaration pursuant to FRCP 12(f).  Def.'s Mot.

7   to Strike at 1 (docket no. 173).  The United States' motion to strike, docket no. 173, was

8   previously denied by Minute Order, docket no. 175, for the following reasons.  Motions

9   to strike are disfavored "and 'should be denied unless the matter has no logical

10  connection to the controversy at issue and may prejudice one or more parties.'"  *Johnson*

11  *v. U.S. Bancorp*, No. C11-02010, 2012 WL 6615507, at *7 (W.D. Wash. Dec. 18, 2012)

12  (citation omitted).  The Court considered Engelstein's supplemental response because it

13  finally addressed in part the issues presented by the United States' motion to dismiss.[4]

14          The Court also considered the Declaration of Greg Gebhard to the extent it

15  presents any admissible evidence.  Although motions to strike under Rule 12(f) are

16  _____

17  [4] The United States filed its motion to dismiss on May 4, 2023, and the motion was originally noted for
    May 26, 2023.  Engelstein requested additional time to complete discovery and to respond to the motion
18  to dismiss.  Pl.'s Mot. to Reset Discovery and Related Deadlines (docket no. 132); Notice of Mot.
    Renoted (docket no. 137).  The motion to dismiss was renoted for June 16, 2023.  Min. Entry (docket
19  no. 138).  On June 13, 2023, Engelstein filed a response to the motion to dismiss.  Pl.'s Resp. Br. (docket
    no. 149).  Engelstein subsequently filed an additional motion for extension of time to complete discovery
    and a motion for additional time to further respond to the motion to dismiss.  Pl.'s Mot. to Extend
20  Discovery Deadline (docket no. 152); Pl.'s Mot. for Extension of Time (docket no. 157).  The Court
    permitted Engelstein to conduct additional depositions and to file a supplemental response.  Min. Entry
21  (docket no. 161).  The motion to dismiss was renoted for July 28, 2023.  *Id.*  On July 31, 2023, Engelstein
    filed a supplemental response to the motion to dismiss.  Pl.'s Supp. Resp. Br. (docket no. 171).  In the
22  supplemental response, Engelstein addressed for the first time whether ACI was an independent
    contractor for purposes of the FTCA.

23

limited to pleadings, motions to strike materials that are not part of the pleadings can be

construed as an invitation "to consider whether the [proffered material] may properly be

relied upon." *Nat. Res. Def. Council v. Kempthorne*, 539 F. Supp. 2d 1155, 1161–62

(E.D. Cal. 2008) (citations omitted) (alteration in original).  On numerous occasions in

his declaration, Gebhard qualifies his statement with phrases such as "I believe" or "it is

my understanding."  Gebhard Decl. at 2–4 (docket no. 170).  Such statements raise

doubts as to Gebhard's personal knowledge.  *Compare Milton H. Greene Archives, Inc. v.*

*CMG Worldwide, Inc.*, No. CV 05-2200, 2008 WL 11334030, at *15 (C.D. Cal. Mar. 17,

2008) ("Declarations based on information and belief, rather than on personal knowledge,

are insufficient to create a genuine issue of material fact." (citations omitted)), *with*

*Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1201 (C.D. Cal. 2007) (noting that facts

alleged on belief or understanding do not create a genuine issue of fact but personal

knowledge "can be inferred from a declarant's position with a company or business").

Bearing this issue in mind, the Court considered the admissible portions of the Gebhard

Declaration and gave them the appropriate weight.

**B.**     **The United States' Rule 12(b)(1) Motion**

A Rule 12(b)(1) motion seeks dismissal of a claim for lack of subject matter

jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  When responding to factual attacks on subject

matter jurisdiction,[5] plaintiffs "must present 'affidavits or any other evidence necessary

---

[5] Here, the United States makes only a factual attack and does not assert a facial challenge to the Court's jurisdiction.

1    to satisfy [their] burden of establishing that the court, in fact, possesses subject matter

2    jurisdiction.'" *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016) (alteration in

3    original, quoting *Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1121 (9th

4    Cir. 2009)).  The Court "may look beyond the pleadings to the parties' evidence without

5    converting the motion to dismiss into one for summary judgment." *Id.* (citing *White v.*

6    *Lee*, 277 F.3d 1214, 1242 (9th Cir. 2000)).  When "evaluating the evidence, the court

7    'need not presume the truthfulness of the [plaintiff's] allegations.'" *Id.* (quoting *White*,

8    277 F.3d at 1242).  "Any factual disputes, however, must be resolved in favor of [the

9    plaintiff]." *Id.* (citing *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996)).

10        The FTCA contains a "limited waiver of sovereign immunity, making the Federal

11   Government liable to the same extent as a private party for certain torts of federal

12   employees acting within the scope of their employment." *United States v. Orleans*, 425

13   U.S. 807, 813 (1976).  Because suit can be brought against the United States "only to the

14   extent that it has waived its immunity," courts must carefully heed exceptions to any such

15   waiver. *Id.* at 814.  The United States' assertion that, in this case, the independent

16   contractor and discretionary function exceptions deprive the Court of jurisdiction presents

17   threshold questions severable from the merits of the case, which are appropriately

18   decided under Rule 12(b)(1). *Clemons v. United States*, No. 2:21-CV-09194, 2022 WL

19   4596651, at *1 (C.D. Cal. July 7, 2022).  Although Plaintiff has the burden of persuading

20   the Court that it has subject matter jurisdiction, "the United States bears the burden of

21   proving the applicability of one of the exceptions to the FTCA's general waiver of

22

23

immunity." *Prescott v. United States*, 973 F.2d 696, 703 (9th Cir. 1992).  The Court

addresses each exception asserted by the United States.

### a.  Independent Contractor Exception

The independent contractor exception to the FTCA's waiver of immunity bars

liability against the United States in instances where the conduct in question was

perpetrated by "any contractor with the United States." 28 U.S.C. § 2671.  The United

States "cannot be held vicariously liable for the negligence of an employee of an

independent contractor." *Yanez v. United States*, 63 F.3d 870, 872 (9th Cir. 1995)

(citations omitted).  To determine if the independent contractor exception applies, courts

distinguish a federal employee from a contractor by evaluating "the existence of federal

authority to control and supervise the 'detailed physical performance' and 'day to day

operations' of the contractor." *Ducey v. United States*, 713 F.2d 504, 516 (9th Cir.

1983); *see also Carrillo v. United States*, 5 F.3d 1302, 1304 (9th Cir. 1993); *Autery v.

United States*, 424 F.3d 944, 956 (9th Cir. 2005).  A determination that the independent

contractor exception applies is not, however, the end of the analysis.  *Edison*, 822 F.3d at

518.  Courts must also evaluate "whether [the plaintiff] alleged a separate nondelegable

or undelegated duty, which the United States could be held directly liable for breaching."

*Id.*  "Only upon a finding that the government delegated its *entire* duty of care may the

court dismiss the claim for lack of jurisdiction under the FTCA's independent contractor

exception." *Id.* (emphasis in original).  The Court addresses whether the United States

may be held vicariously liable for ACI's negligence or directly liable for breaching a

nondelegable duty.

i.   **Independent Contractor or Federal Employee**

The United States argues that ACI was an independent contractor and that the United States cannot be vicariously liable for ACI's allegedly negligent construction, installation, or maintenance of the low water crossing grates.  The United States asserts that it did not have "authority to control and supervise the 'detailed physical performance' and 'day to day operations'" of ACI.[6]  *See Autery*, 424 F.3d at 956 (quoting *Hines v. United States*, 60 F.3d 1442, 1446 (9th Cir. 1995)); *see also Ducey*, 713 F.2d at 516.  The United States may use detailed contractual provisions to "'fix specific and precise conditions to implement federal objectives' without becoming liable for an independent contractor's negligence." *Autery*, 424 F.3d at 957 (quoting *Orleans*, 425 U.S. at 816).  "[D]etailed regulations and inspections are [not] evidence of an employee relationship." *Id.* (alterations in original, quoting *Letnes v. United States*, 820 F.2d 1517, 1519 (9th Cir. 1987)).  An individual may be deemed "acting as a government employee" only if the United States exercised "substantial supervision over the day-to-day operations of the contractor." *Id.* (quoting *Letnes*, 820 F.2d at 1519).

Here, analogous cases teach that, given the structure of ACI's and OldCastle's relationship with the FHWA, the two entities fall neatly into the categories of independent contractor and subcontractor, respectively. *See Clemons*, 2022 WL 4596651, at *1–3 (describing the United States as forming contractor and subcontractor

---

[6] Federal law determines whether ACI was an independent contractor or federal employee. *Autery*, 424 F.3d at 957 (citing *Billings v. United States*, 57 F.3d 797, 800 (9th Cir. 1995)).

relationships where the contractor was responsible for daily supervision of the

subcontractor's janitorial services); *Marcus v. United States*, No. 96CV97, 1997 WL

1051847, at *1 (E.D. Va. May 29, 1997) (recommending dismissal based on the

independent contractor exception in a case involving a similar FHWA contract for road

resurfacing and a similar bicycle accident). In *Marcus*, the plaintiff was riding his

bicycle on a parkway, which was owned by the United States. 1997 WL 1051847, at *1.

The plaintiff was injured when the bicycle's front tire "slipped into an expansion joint"

between concrete slabs on a portion of the parkway that was under repair. *Id.* At the

time of the plaintiff's bicycle accident, Century Concrete, Inc. ("Century") was

resurfacing the parkway pursuant to a FHWA-awarded contract. *Id.* The plaintiff

asserted that Century created the dangerous condition during the resurfacing and that the

United States negligently failed to warn of the dangerous condition and allowed it to

continue. *Id.* Looking to the contract between the United States and Century, the court

determined that Century was not an agent or employee of the United States, and thus, the

United States was not liable for Century's actions. *Id.* at *2–3. The court noted the

contract stated that "[a]t all times during performance of this contract and until the work

is completed and accepted, the Contractor shall directly superintend the work." *Id.* at *1

(alteration in original). The contract also provided that Century was responsible "for

obtaining all permits and licenses, providing a safe work environment, and . . . all

materials delivered and work performed until completion and acceptance of the entire

ORDER - 12

1    project."[7]  *Id.* at *3.  Furthermore, the record contained no evidence or allegation that the

2    United States controlled Century's day-to-day physical operations.  *Id.*  Thus, the court

3    concluded that it did not have jurisdiction.  *Id.*

4          Similarly here, the Contract establishes that the United States was not responsible

5    for ACI's day-to-day operations.  Like the contract in *Marcus*, the Contract in this case

6    states that "[a]t all times during performance" of the Project "and until the work is

7    completed and accepted, [ACI] shall directly superintend the work or assign and have on

8    the worksite a competent superintendent who is satisfactory to the [FHWA] and has

9    authority to act for [ACI]."  Ex. D to Johnson Decl. at 23.  In addition, ACI was

10   responsible for obtaining its own permits, licenses, materials, and equipment.  *Id.* at 23.

11   ACI also agreed to assume all responsibility for injuries arising as a result of its own

12   negligence.[8]  *Id.*  Thus, as in *Marcus*, ACI was an independent contractor for, rather than

13   an agent or employee of, the United States.

14         In a supplemental response, Engelstein suggests ACI was not an independent

15   contractor because the United States was "intimately involved on a daily basis with

16   _____

17   [7] In the Background section, the *Marcus* Court pointed out that the contract between the United States and
     Century "contained an accident prevention clause which required Century to, among other things,

18   'safeguard the public and government personnel, property, materials, supplies, and equipment exposed to
     Contractor operations and activities' and 'provide appropriate safety barricades, signs, and signal lights.'"
     1997 WL 1051847, at *1.  The contract also provided that Century "would be 'responsible for all

19   damages to persons or property that occur as a result of the Contractor's fault or negligence.'"  *Id.*

20   [8] The Standard Specifications, which were incorporated into the Contract, provide that ACI was required
     to indemnify the United States from suits brought for injuries or damage sustained as a result of negligent
     performance of the Contract.  Ex. G to Johnson Decl. at 36, § 107.05.  In addition, the Standard

21   Specifications explicitly state that ACI is an independent contractor for, and not an agent or employee of,
     the United States.  *Id.* at 37, § 107.09.  The Standard Specifications further provide that ACI is liable for

22   any action or inaction of subcontractors.  *Id.* at 39, § 108.02.

23

managing the contractor's performance in conformity with the Project contract."[9]  Pl.'s

Supp. Resp. Br. at 7 (docket no. 171).  Plaintiff's argument is misplaced because nothing

in the record indicates that the United States substantially supervised ACI's day-to-day

operations such that ACI was not an independent contractor.  Although Engelstein points

out that the United States had a project engineer on site daily during construction, *see*

Traffalis Dep. at 24:5–9 & 60:18–24 (docket no. 162-2); Gebhard Decl. at ¶¶ 7–8 (docket

no. 170), the presence of federal employees does not establish that the United States

exercised substantial supervision over ACI's physical performance of the contract.  *See*

*Hsieh v. Consol. Eng'g Servs., Inc.*, 569 F. Supp. 2d 159, 178 (D.D.C. 2008) (finding that

the federal government did not exercise detailed control or day-to-day supervision of a

contractor's physical performance of a contract even though federal "personnel were out

'on the street' every day," and "performed routine inspections" because the contract

provided the federal government with the right the inspect the contractor's work).  As in

*Hsieh*, in this case, the record does not demonstrate that the federal government's on-site

project engineer was there to manage ACI's day-to-day operations such as how and when

to do the work.  Instead, the federal government's project engineer was on-site to ensure

ACI's compliance with certain standards and the Contract itself, as required by the

separate agreement between the federal agencies and King County.  *See* Ex. A to Johnson

Decl. at 6.[10]  In sum, the Contract provides that ACI was responsible for its own daily

---

[9] Engelstein did not make this argument in his initial response.  *See* Pl.'s Resp. Br. at 6 (docket no. 149).

[10] The Forest Highway Project Agreement for Middle Fork Snoqualmie River Road stated:  "During the construction phase of the project, [the Western Federal Lands Highway Division] will provide a Project

1    tasks and supervision.  Ex. D to Johnson Decl. at 23.  Indeed, ACI was responsible for

2    constructing, installing, and maintaining the grates that allegedly caused Engelstein's

3    injuries.  *See* Ex. E to Johnson Decl. at 33–49.  Thus, the independent contractor

4    exception applies, sovereign immunity has not been waived, and the Court lacks

5    jurisdiction over Engelstein's claim that the low water crossing grates were negligently

6    constructed, installed, or maintained.

7              ii.      **<u>Nondelegable Duty</u>**

8              Notwithstanding ACI's status as an independent contractor, the Court must

9    determine whether the United States may be held directly liable for breaching a

10   nondelegable or undelegated duty.  *Edison*, 822 F.3d at 518.  Engelstein argues that the

11   United States is directly liable because it owed him a nondelegable duty of safety.  Pl.'s

12   Resp. Br. at 7 (quoting *Edison*, 822 F.3d at 518); Pl.'s Supp. Resp. Br. at 1–2, 7.

13   "Whether the United States may be held liable under the FTCA for its own acts or

14   omissions is a three-step inquiry."  *Edison*, 822 F.3d at 519.  First, courts determine

15   whether state law "would impose a duty of care on a private individual in a similar

16   situation."  *Id.* (citations omitted).  Second, if state law would impose such duty, courts

17   "then look to the contract and the parties' actions to determine whether the United States

18   retained some portion of that duty for which it could be held directly liable."  *Id.*

19   (citations omitted).  Third, "even if it appears that the government delegated all of its

20

21   _____

22   Engineer to oversee and inspect the work, and to ensure a quality product that meets all applicable
     Federal, State and Local Standards and environmental requirements."  Ex. A to Johnson Decl. at 6.

23

ORDER - 15

duties to the independent contractor, we ask whether [state] law would impose any

*nondelegable* duties on the government."[11]  *Id.* (citations omitted) (emphasis in original).

Engelstein cites the abnormally dangerous and/or peculiar risk exceptions to the

general rule that a principal is not liable for injuries caused by an independent

contractor.[12]  Pl.'s Resp. Br. at 4, 7, 13, 20, 22.  In the alternative, Engelstein argues that

landowner-premises liability applies to this case, thus attaching a nondelegable duty of

safety.  These exceptions do not apply to the facts of this case.[13]

First, under Washington law, the act of reconstructing a road or installing a low

water crossing is not an abnormally dangerous activity and does not pose a peculiar risk.

*See Schuck v. Beck,* No. 36754-1-III, 2020 WL 1922774, at *5 (Wash. Ct. App. Apr. 21,

2020) (setting forth the six factors outlined in Section 520 of the Restatement (Second) of

Torts that should be considered in determining whether an activity is abnormally

dangerous and holding that transporting pressurized hazardous material to aid in the

---

[11] The second step of the *Edison* analysis is not relevant in this case because the Court finds that the United States has delegated all of its duties to ACI regarding constructing, installing, and manufacturing the grates.  *See Lentz v. United States Air Force,* No. CV-17-1660, 2018 WL 3416993, at *4 (D. Ariz. July 13, 2018) (finding that the second step of the *Edison* analysis was irrelevant after the court determined that the United States delegated all of its duties to an independent contractor).  As in *Lentz,* however, the Court analyzes Engelstein's claim that, under the third step of the *Edison* analysis, the United States should be held liable because Washington law imposes on it a nondelegable duty.  *See id.*

[12] "Under the FTCA, the United States may not be held vicariously liable. However, [peculiar risk] liability has been construed as creating direct liability for the government's nondelegable duty to ensure that the contractor employs proper safety procedures."  *Edison*, 822 F.3d at 518 n.4 (alteration in original).  Thus, where an employer has delegated some responsibilities to an independent contractor, the employer may still be liable if the delegated responsibilities were "nondelegable" because the work performed is "inherently dangerous" or presents a "peculiar risk."  *Id.* at 518 & n.4.

[13] Engelstein's argument that AASHTO standards bind the United States to a nondelegable duty of safety is meritless.  AASHTO is a private organization that promulgates industry best-practices—it does not have the force of law.  Engelstein's argument sounds in a breach of contract analysis, not a tort analysis.

ORDER - 16

1   construction of a road was not an abnormally dangerous activity); *see also Stout v.*

2   *Warren*, 176 Wn. 2d 263, 273, 290 P.3d 972 (2012) (setting forth the four factors to

3   consider in assessing whether an activity poses a peculiar risk); *Hansen v. Horn Rapids*

4   *O.R.V. Park of the City of Richland*, 85 Wn. App. 424, 433, 932 P.2d 724 (1997) (stating

5   that "employment of emergency medical personnel does not involve a peculiar risk of

6   harm").

7          Second, Engelstein does not argue that ACI and OldCastle performed the work in

8   an unsafe manner.  Instead, Engelstein seeks to impose vicarious liability on the United

9   States for the allegedly negligent acts of the independent contractor and/or its

10  subcontractor.  Unless, however, a contractor performs work in an unsafe manner, which

11  might lead to direct liability against the United States, the FTCA expressly precludes the

12  imposition of vicarious liability against the government for the actions of independent

13  contractors.  *See McCall v. U.S. Dep't of Energy*, 914 F.2d 191, 195 (9th Cir. 1990)

14  (rejecting argument that government can be held vicariously liable for negligence of

15  independent contractors under state-law "nondelegable duty" doctrine); *Lentz*, 2018 WL

16  3416993, at *4 ("Plaintiff's argument fails to address the fact that state law cannot

17  preempt the FTCA if the state law imposes strict liability on the Government." (citing

18  *inter alia Bramer v. United States*, 595 F.2d 1141, 1144 n.7 (9th Cir. 1979))).

19         Finally, as to Engelstein's premises liability theory, Engelstein describes a

20  nondelegable duty owed by a possessor of land under Arizona and California law.  Pl's

21  Resp. Br. at 20–22.  This doctrine does not apply here because (i) the United States was

22  not a possessor of land—the County owns the Road; (ii) the duty in this case is governed

23

by Washington law, and Arizona and California law is inapplicable; and (iii) Arizona and California law impose strict liability on the possessor of land for the harm caused by the negligence of a contractor to maintain it safely, which cannot apply with respect to the FTCA's limited waiver of sovereign immunity.  *See Lentz*, 2018 WL 3416993, at *4. The United States has thus carried its burden as to the independent contractor exception, and the United States is entitled to dismissal for lack of subject matter jurisdiction.

### b.   Discretionary Function Exception

Engelstein appears to also or alternatively allege that the United States is directly liable for his injuries because the United States negligently approved the design for the low water crossings.  The United States argues that its decisions about the low water crossings are protected by the discretionary function exception to the FTCA's waiver of sovereign immunity.  The discretionary function exception precludes liability for the performance or nonperformance of "a discretionary function or duty on the part of a federal agency or an employee of the Government."  28 U.S.C. § 2680; *see also Sabow v. United States*, 93 F.3d 1445, 1451 (9th Cir. 1996).  The discretionary function exception applies regardless of whether the government agent was negligent in his or her duties, so long as those duties were discretionary.  *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1029 (9th Cir. 1989).  For the exception to apply, the challenged action must be both (1) discretionary—i.e., not compelled by statute, policy, or regulation, and (2) the type of action Congress meant to protect—i.e., an action that "involves a decision susceptible to social, economic, or political policy analysis."  *Whisnant v. United States*, 400 F.3d 1177, 1180–81 (9th Cir. 2005); *see also United States v. Gaubert*, 499 U.S. 315,

322 (1991) ("The exception covers only acts that are discretionary in nature, acts that 'involve an element of judgment or choice.'").

Here, the alleged conduct is discretionary—no statute, policy, or regulation required the FHWA to adhere to a particular design for the low water crossings or prohibited it from delegating design duties to an independent contractor. *See* Exs. H–K to Johnson Decl.; *see, e.g., Williams v. United States*, 50 F.3d 299, 309 (4th Cir. 1995) ("The regulations . . . do not prescribe a course of action, but impart to the United States the discretion to exercise judgment and choice to contract for the maintenance of premises it occupies.") (cited with approval by *Munger v. U.S. Soc. Sec. Admin.*, No. C19-5571, 2020 WL 6874792, at *2 (W.D. Wash. Nov. 23, 2020)).  Although Plaintiff argues that the AASHTO guidelines, incorporated by the Contract, mandated a particular course of conduct, no statute, policy, or regulation required the FHWA to comply with the AASHTO guidelines.  The choice to follow AASHTO's recommendations was itself discretionary.[14]  The first prong of the discretionary function exception test is therefore satisfied.

As to the public policy analysis element, a "strong presumption" exists that "the second part of th[e] *Gaubert* test is satisfied if a court concludes that the employee was exercising discretion," *A.O. Smith Corp. v. United States*, 774 F.3d 359, 365 (6th Cir.

---

[14] In any event, the AASHTO guidelines do not provide for a fixed, mandatory design for grates on a low water crossing.  *See, e.g.,* Nordstrom Report at 11, Ex. 3 to Notice (docket no. 144-3 at 12) ("The gap between the drainage grate and its frame should be 1 in. (25mm) or less.").  And, although a failure to follow the AASHTO guidelines might bolster a hypothetical negligence case against a defendant, that does not mean the AASHTO guidelines carry the force of law.  They are no more than evidence of industry best practices.

2014) (quoting *Gaubert*, 499 U.S. at 324), as the Court has concluded above.  Ninth

Circuit jurisprudence, however, also requires the United States, in seeking to demonstrate

that the "discretionary function" exception applies, to identify "reasonable support in the

record for a court to find, without imposing its own conjecture, that a decision was

policy-based or susceptible to policy analysis." <u>Bear Medicine v. United States</u>, 241 F.3d

1208, 1216 (9th Cir. 2001).  Here, the United States relies on FHWA regulations that

supplement the agency's policies concerning the National Highway System.  *See* Defs.'

Mot. at 23 (docket no. 124) (citing 23 C.F.R. §§ 625.3(a)(1)(i)–(iv) (articulating, "in

addition to the criteria described in § 625.2(a)," four factors to consider in establishing

design and construction standards for highways: (1) the constructed and natural

environment of the area; (2) the environmental, scenic, aesthetic, historic, community,

and preservation impacts of the activity; (3) cost savings by taking advantage of

flexibility that exists in current design guidance and regulations; and (4) access for other

modes of transportation.)  The United States also cites the FHWA's publications

concerning (i) hydraulic design of highway culverts, and (ii) geomorphic, biological, and

engineering design considerations for low water crossings as evidence that the decisions

to install low water crossings, where to install them, what type to install, and/or how to

design them are policy-based or susceptible to policy analysis.  *See id.* (citing Ex. H to

Johnson Decl. at 3, § 1.3.5; Ex. J to Johnson Decl. at 12–13).  These materials support the

United States' assertion that the second prong of the discretionary function standard is

satisfied.  Further, as indicated by the United States, in determining whether low water

crossings are advantageous to the specific site, officials perform an economic evaluation,

which takes into consideration "all lifecycle costs including maintenance, repairs, user

costs, and the cost of environmental impacts." Ex. J to Johnson Decl. at 11. ACI's

request to redesign the grates from a diamond-pattern grate to a rectangular-pattern grate

exemplifies how the grate design involved or was susceptible to economic policy

analysis. *See* Ex. E to Johnson Decl. at 33–38.

The Project also involved a low-volume road on resource-sensitive public lands.

"These areas have significant and diverse stakeholders, regulations, management goals,

environmental resources, cultural resources, wildlife, scenic beauty and intrinsic value."

Ex. I to Johnson Decl. at 5 (docket no. 125-9). Therefore, the technical work on the Road

had to embrace several key project delivery objectives including, but not limited to, being

respectful of the land, wildlife, and habitat, providing safe passage for travelers and

wildlife, minimizing impacts to existing features in a "lightly on land" manner, and

completing quality work within budget constraints, recognizing that funding is often

comparatively less for low-volume roads. *Id.* The FHWA had to consider all of these

goals when determining whether, where, and how to install the low water crossings.

Federal courts have determined that analogous considerations qualify as policy

determinations. *See, e.g., Hager v. United States*, No. 3:19-0673, 2020 WL 2544421, at

*2 (S.D. W. Va. May 19, 2020) (concluding that the design, installation, maintenance,

operation, and lack of warning attending a culvert used to manage water runoff fell under

the discretionary function exception); *E. Ritter & Co. v. Dep't of Army, Corps of Eng'rs*,

874 F.2d 1236, 1241 (8th Cir. 1989) (design and construction of flood control ditch was

protected by the discretionary function exception). The Court sees no reason to depart

ORDER - 21

1  from the rationale in these cases.  Both prongs of the discretionary function exception

2  having been met, the Court lacks subject matter jurisdiction over Plaintiff's claim that the

3  United States negligently approved the design for the low water crossings.

4  **<u>Conclusion</u>**

5  For the foregoing reasons, the Court ORDERS:

6  (1)  The United States' motion to dismiss, docket no. 124, having been

7  GRANTED for the reasons set forth in this Order, Plaintiff's claims against the United

8  States Department of Agriculture, United States Forest Service, United States Department

9  of Transportation, United States Department of Highways, United States Federal

10  Highway Administration, and the Western Federal Lands Highway Division of the

11  FHWA are hereby DISMISSED for lack of subject matter jurisdiction.

12  (2)  Plaintiff and King County having reached a settlement, *see* Notice (docket

13  no. 176), Plaintiff's claims against King County are DISMISSED with prejudice and

14  without costs, provided that Plaintiff may move within fourteen (14) days of the date of

15  this Order to reinstate his claims against King County in the event that the parties are

16  unable to perfect their settlement.

17  (3)  Pursuant to Plaintiff's "Motion to Dismiss Extraneous Defendants," docket

18  no. 177, which is treated as a notice of voluntary dismissal, Plaintiff's claims against the

19  unidentified and non-appearing defendants (Does I–X and S.E.A. Construction LLC) are

20  DISMISSED without prejudice.

21  (4)  The parties having stipulated to dismiss Plaintiff's claims against the State

22  of Washington, *see* Stipulation (docket no. 97), the Court having previously granted

23

1  summary judgment against Plaintiff and in favor of Active Construction, Inc. and

2  OldCastle Precast a/k/a Oldcastle Infrastructure, Inc., *see* Order (docket no. 90), and all

3  claims against all parties having now been resolved, the Court DIRECTS the Clerk to

4  enter judgment consistent with the Court's rulings in this matter.

5       (5)    The Clerk is further DIRECTED to send a copy of this Order and the

6  Judgment to all counsel of record.

7       IT IS SO ORDERED.

8       Dated this 11th day of September, 2023.

9

10

11  Thomas S. Zilly
    United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

ORDER - 23